STATE of Missouri, Respondent,

v.

Oliver J. SAMUELS, Defendant–
Appellant.

Oliver J. SAMUELS, Movant–Appellant,

v.

STATE of Missouri, Respondent.

Nos. 18905, 19949.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 1, 1995.

Robert E. Steele, Jr., Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

PARRISH, Judge.

Oliver J. Samuels (defendant) was convicted, following a jury trial, of robbery in the second degree. § 569.030.[1] He was sentenced to imprisonment for a term of 5 years. Defendant thereafter filed a motion for post-conviction relief pursuant to Rule 29.15. The motion was denied after an evidentiary hearing.

Defendant appeals the judgment of conviction in the criminal case (No. 18905) and the order denying his Rule 29.15 motion (No. 19949). The appeals were consolidated as required by Rule 29.15(*l*). This court affirms the judgment of conviction and the order denying the Rule 29.15 motion.

### No. 18905

Defendant entered a store in Joplin, Missouri, known as "Name Brand Clothing." He attempted to return a sweatshirt. Defendant had no tag or receipt of purchase that would verify the shirt had been purchased at the store. However, he claimed he bought the sweatshirt there the day before.

Following a discussion, the store's cashier told defendant she would permit him to return the sweatshirt in exchange for a $.99 credit. Defendant began shopping for other merchandise. He went to the men's section of the store, picked out three items—two pairs of jeans and a shirt—and took them to a dressing room.

After about ten minutes defendant came out of the dressing room. He had one pair of jeans laying over his arm. He walked to the cashier and laid them on a counter. The cashier walked to the dressing room and observed three empty hangers. She asked defendant where the other items of clothing were. He said he did not know what she was talking about.

The store manager walked up to defendant and lifted his shirt. He observed that defendant was wearing a pair of jeans beneath the trousers he wore as an outer garment. The manager told the cashier to call the police.

Defendant got away from the manager and ran to a nearby restaurant where he entered a restroom. He removed the jeans and placed them in the water tank behind a toilet. He was later arrested.

Defendant called two witnesses at trial, Dustin Anderson and Russell Cobb. Ms. Anderson was living with defendant on the date of the offense, January 29, 1993. She took defendant to the Oak Hill Hospital early that morning where a procedure she identified as "an E.D.G." was performed.[2] She said they arrived at the hospital around 6:00 a.m. They left the hospital "around 9:00 or 9:30" after the procedure was performed. Ms. Anderson took defendant to his home. She had been told not to let defendant drive.

About noon, approximately three hours after Ms. Anderson took defendant home, she took him to the Name Brand Clothing store. She went along to keep him from driving. She said his condition had improved since arriving home—"[H]e was better than when we first got home, but still kind of hyper."

The drive to the store took about fifteen or twenty minutes. Defendant was carrying a Name Brand Clothing bag with something in it. Ms. Anderson explained what happened when they arrived at the store.

Q. [by defendant's trial attorney] Okay. And when you got to Name Brand and he got out of the truck, what did he have with him?

. . . . .

A. He had the bag with him.

Q. Did you see him go into the store?

A. Yeah. Yes, I did.

---

1. References to statutes are to RSMo 1986 unless otherwise stated.

2. Defendant's trial attorney explained to the trial court that the procedure defendant underwent was esophagogastroduodenoscopy. The attorney's explanation of the procedure was, "[T]hey put … a tube down his throat with a camera and checked out his stomach and gastro lining, that sort of thing. And in order to do that, they gave him some Demerol and some Versed in order to, to knock him out, basically."

Q. How long was it before you saw him again?

A. Fifteen, twenty minutes.

Q. Okay. What was happening the next time you saw him?

A. He was running out of the store, being chased, very, very quickly.

Ms. Anderson saw defendant fighting with the store manager. He pulled away from the manager and ran to the truck where she was waiting. He told her to start the truck and leave. She refused. Defendant took off running.

Ms. Anderson testified that after defendant returned home from the hospital, a neighbor she identified as Rusty came to see defendant; that she "[g]ave him a jump start for his car."

"Rusty" was Russell Cobb. Mr. Cobb testified that he lived next door to defendant January 29, 1993; that he went to defendant's apartment that morning about "11:00 or 12:00 o'clock." He went there to get a jump start for his car. He asked defendant to help him. He said defendant "looked high." Ms. Anderson helped Mr. Cobb start his car.

At the conclusion of defendant's evidence, his trial attorney offered "Defendant's Exhibit 1"—defendant's medical record from Oak Hill Hospital. It was offered for the purpose of showing defendant received medication at the hospital. Defendant contended it was evidence of involuntary intoxication. The state stipulated that if the custodian of the record were called, the custodian would testify that the exhibit was a medical record of the hospital. The state objected, however, to the record's admission in evidence contending it was not evidence of involuntary intoxication. Defendant's trial attorney responded, "I'm offering it because I believe that it is relevant on the issue of his involuntary intoxication." The trial court sustained the state's objection.

Defendant tendered two jury instructions that the trial court refused, Instruction Nos. A and B. Instruction No. A is a Not-in-MAI instruction that includes the language, "A drugged condition of a person is involuntarily produced when it is brought about by the introduction into his body of any substance at the direction of a licensed medical practitioner for a legitimate medical purpose."

Instruction No. B is patterned according to MAI–CR3d 310.52. The Notes on Use for MAI–CR3d 310.52 require that it be given "[w]hen there is evidence of an involuntary intoxicated or drugged condition ... upon written request in proper form by the state or by the defendant."

Point I contends the trial court erred in refusing to admit Defendant's Exhibit 1 because it was relevant in that "it logically tended to prove that [defendant] was involuntarily drugged or intoxicated at the time of committing the offense." It further contends the trial court erred in refusing to give Instruction Nos. A and B to the jury because there was evidence that defendant was in an "involuntary drugged condition."

The stated purpose for offering Defendant's Exhibit 1 was to establish the defense of involuntary intoxication. The exhibit listed medications administered to defendant during the E.D.G. procedure. Defendant contends the effects of these medications rendered him involuntarily intoxicated; that this deprived him of the capacity to know or appreciate the quality of his conduct in committing the acts that constitute robbery in the second degree.

Section 562.076 provides:

1. A person who is in an intoxicated or drugged condition whether from alcohol, drugs or other substance, is criminally responsible for conduct unless such condition is involuntarily produced and deprived him of the capacity to know or appreciate the nature, quality or wrongfulness of his conduct.

2. The defendant shall have the burden of injecting the issue of intoxicated or drugged condition.

Defendant argues that since the drugs were administered to him in the course of a medical procedure, his ingestion of them was involuntary; that the medical report showing what medication was administered was, therefore, relevant.

If the ingestion of the medication was an involuntary act by defendant, Defendant's Exhibit 1 would be relevant.[3] It would identify the drugs that were administered and, therefore, bear on the issue of whether defendant had "the capacity to know or appreciate the nature, quality or wrongfulness of his conduct." § 562.076.1.

If taking the medication was a voluntary act, § 562.076 affords no defense. *State v. Shields,* 862 S.W.2d 503, 504–05 (Mo.App. 1993); *State v. Elam,* 779 S.W.2d 716, 717 (Mo.App.1989). Defendant's Exhibit 1 would not be relevant.

The question of what constitutes involuntary intoxication was discussed in *State v. Bishop,* 632 S.W.2d 255 (Mo.1982). The discussion in *Bishop* focused on the question, "Is the drugged condition of a defendant 'involuntarily produced' within the meaning of the statute merely because the defendant taking the drugs is a drug addict?" *Id.* at 257. In deciding it was not, the court reviewed the history of § 562.076, RSMo 1978.[4] In its review, the court relied on statutes of other states and cases interpreting those laws. The laws of Illinois and Kansas were among those *Bishop* found persuasive.

*Bishop* noted that the Illinois statute was almost identical to Missouri's. It quoted from *People v. Quinn,* 360 N.E.2d 1221, 46 Ill.App.3d 579, 4 Ill.Dec. 846 (4th Dist.1977): "Illinois courts have stated that involuntary intoxication can only be caused by trick, artifice or force. (*Bartholomew v. People* (1882), 104 Ill. 601; *People v. Walker* (1975), 33 Ill.App.3d 681, 338 N.E.2d 449)." 4 Ill.Dec. at 849, 360 N.E.2d at 1224.

Observing that the applicable Kansas statute stated "essentially the same thing as § 562.076 [RSMo 1978]," *Bishop* quoted from *State v. Palacio,* 559 P.2d 804, 221 Kan. 394 (1977), a case that addressed the question of what is required to show involuntary intoxication. The Kansas court said that involuntary intoxication requires one to be compelled by an irresistible force to partake of

intoxicants. It explained that "irresistible force" did not mean habit, desire, or any other type of internal compulsion. "It means that intoxicants or drugs were forcibly, unwittingly or unknowingly ingested by or administered to the defendant." 559 P.2d at 806.

The rationale of *Bishop* and of the out-of-state cases discussed in *Bishop* was followed in *State v. Shields, supra. Shields* involved a defendant who was addicted to heroin. He was using methadone to alleviate his drug addiction. He argued that the effects of the use of the prescribed methadone constituted involuntary intoxication. *Shields* held, "A drugged condition of a person is involuntarily produced when it is brought by the introduction into his body of any substance which he does not know and has no reason to know has a tendency to cause such a drugged condition." *Id.* at 505. The court pointed out that there was no evidence the defendant in that case did not know or have reason to know that ingestion of methadone caused a drugged condition. It found no showing of involuntary intoxication.

■ In this case defendant consented to the medical procedure that required him to be medicated. As in *Shields,* there was no evidence that this defendant did not know that the medication used in the medical procedure would produce a drugged condition. The medication was not imposed on defendant by trick, artifice or force.

■ The determination of relevancy of evidence is within the discretion of trial courts. *State v. Shurn,* 866 S.W.2d 447, 457 (Mo. banc 1993). An appellate court will reverse that determination only if a trial court committed an abuse of discretion. *Id.* Defendant's ingestion of medication was voluntary. The trial court committed no abuse of discretion in refusing to admit Defendant's Exhibit 1 into evidence.

3. "For evidence to be relevant, it needs only to logically tend to prove a fact in issue or to corroborate other relevant evidence which bears on a principal issue." *State v. Pagano,* 882 S.W.2d 326, 331 (Mo.App.1994).

4. § 562.076.1(2), RSMo 1978, established the defense of involuntary intoxication. It contained the same language as § 562.076.1 in the 1986 revision, the statute applicable to this case.

There was no evidence of involuntary intoxication. Accordingly, the trial court committed no error by refusing to instruct the jury on that issue. Point I is denied. The judgment of conviction in No. 18905 should be affirmed.

### No. 19949

■ An attorney was appointed to represent defendant following filing of his *pro se* Rule 29.15 motion. An amended motion was filed and an evidentiary hearing held. Defendant claimed the trial counsel in his underlying criminal case was ineffective because he failed to present evidence by way of expert witnesses concerning the potential side effects of medications he took on the date of the criminal offense.

Having determined that there was no evidence of involuntary intoxication, there is no basis for defendant's contention that expert witnesses should have been called to explain that his medication could have produced intoxication. Further, there was no evidence that an expert witness would have testified that the medication would have caused the behavior defendant exhibited.

The motion court received in evidence a report from a physician who had treated defendant. The report addressed the effects of the drugs defendant took. It concluded with the statement that the physician was not aware that the medications would cause the type of behavior defendant exhibited.

The motion court found that "had a pharmacologist or [defendant's] treating physicians been called to testify it would not have shown the [defendant] to be impaired" in the manner claimed. That finding is not clearly erroneous. There was no showing that defendant's trial counsel was ineffective. *See State v. McCann,* 792 S.W.2d 890, 894 (Mo. App.1990). Point II is denied.

### Dispositions

The judgment of conviction in No. 18905 is affirmed. The order denying the motion for post-conviction relief in No. 19949 is affirmed.