STATE of Missouri, Plaintiff–
Respondent,

v.

Mark K. BUTTS, Defendant–Appellant.

Mark K. BUTTS, Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

Nos. 18389, 20570.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 21, 1997.

Rebecca L. Kurz, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for respondent.

SHRUM, Judge.

Mark K. Butts (Defendant) was charged with violating § 566.030, RSMo 1986, by forcibly raping H__ R__ (Victim). Convicted by a jury, he was sentenced to eight years imprisonment pursuant to the verdict. In No. 18389, Defendant appeals the judgment of conviction in his criminal case. He asserts that the trial court erred by excluding evidence that Victim was forcibly raped by her father some thirty-eight years before the trial of this case. He also claims that the trial court committed "plain error" in submitting the "hammer instruction" patterned after MAI–CR3d 312.10. This court affirms in No. 18389.

After sentencing, Defendant sought post-conviction relief under Rule 29.15, which was denied after an evidentiary hearing. In No. 20570 he appeals the denial of that motion following an evidentiary hearing, claiming

that his trial counsel was ineffective for failing to call certain witnesses. This court affirms in No. 20570.

The appeals were consolidated pursuant to Rule 29.15(*l*) as it existed on the date the motion was filed, but we consider each appeal separately.[1]

### Direct Appeal—No. 18389

Defendant does not challenge the sufficiency of the State's evidence. The evidence in the light most favorable to the verdict follows.

On May 11, 1990, Victim, age 41, spent much of the evening at the Maple Street Grill, a restaurant-bar in Buffalo, Missouri. It was there that she first met Defendant and they spent approximately three hours getting acquainted, drinking, and dancing. About 11:15 p.m., Victim decided to leave the bar and go home.

Victim testified that after walking several blocks in the direction of her home, she saw Defendant running towards her. She claimed that her efforts to get away were unsuccessful and that she ultimately submitted to an act of sexual intercourse only because Defendant roughed her up and threatened to kill her by slitting her throat. According to Victim, soon after the rape penetration Defendant abruptly stopped, made the victim get up, and they then returned to the area of the Maple Street Grill. Once there, they got into an automobile that belonged to one of Defendant's acquaintances, Tina Wilson. Soon afterward, Victim escaped from the car and went back inside the bar. Once inside, a bar patron ultimately offered to accompany Victim to the jail and report the attack.

A deputy sheriff who took a written statement from Victim testified that he had noted that Victim had been drinking, but that in his opinion she was not intoxicated. The deputy testified that Victim had reported to him that her assailant's threats were as follows: "You're going to do what I want you to do or I will kill you."

Defendant testified, claiming that the sexual encounter was initiated by Victim after an evening of drinking and intimate dancing, and that she had insisted on sexual intercourse outside rather than inside her house as her child was at home. Defendant also testified that after a minute or two of consensual intercourse, Victim suddenly "stiffened[,]" took her legs from around him, put her arms down, and said, "[i]f you're going to rape me hurry up and get it over with."

Tina Wilson testified for the defense concerning Victim's behavior in the bar and about what Victim had drunk that evening.

Defendant presented extensive testimony from a mental health counselor, Francis Kriesky, about Victim's psychological illnesses, including her post-traumatic stress disorder, hallucinations, and dreams of men raping and stabbing her. However, the trial court rejected Defendant's efforts to have Kriesky and Victim testify that Victim was forcibly raped by her father when she was five years old.

After four hours of deliberation, the jury had not returned a verdict. The trial judge then inquired of the lawyers whether they objected to his giving the jury a "hammer instruction" patterned after MAI–CR3d 312.10, and both indicated that they had no objection. The instruction was given and approximately one hour later, the jury returned with a guilty verdict.

In his first point relied on, Defendant claims the trial court erred when it excluded his proffered evidence that Victim's father forcibly raped her when she was a child and that her post-traumatic stress disorder was caused by those acts of forcible incest. Defendant contends that the excluded evidence was relevant to the issue of consent, and by excluding it, the trial court denied him his constitutionally guaranteed rights to a fair trial and due process. Defendant explains his assertion about the relevancy of this evidence as follows:

> "The . . . defense [in this case] was that 'no rape occurred, but rather that [Victim's

---

1. Rule references are to Missouri Rules of Court (1993). Defendant was sentenced September 14, 1992. His Rule 29.15 motion was filed on July 23, 1993. *See* Rule 29.15(m), Missouri Rules of Court (1996).

accusations against Defendant were] a manifestation of her post-traumatic stress disorder exacerbated by alcohol consumption.' The jury was allowed to hear evidence that [Victim] was diagnosed with post-traumatic stress disorder. The jury was not informed, however, as to the cause of this disorder. The jury could have inferred and should have been given the opportunity to infer that [Victim] perceived the consensual intercourse with [Defendant] as rape due to her rape-induced post-traumatic stress disorder. Without hearing evidence of the cause of [Victim's] post-traumatic stress disorder, the jury was deprived of relevant information as to the issue of consent."

Continuing, Defendant argues in a conclusory fashion that "[w]ithout being informed as to the cause of the post-traumatic stress disorder, the fact that [Victim] was diagnosed with the disorder was meaningless information to the jury." We disagree.

 "[T]he due process clause does not require the admission of irrelevant evidence." *State v. Copeland*, 928 S.W.2d 828, 837[1] (Mo. banc 1996). "Neither does it require the admission of all relevant evidence." *Id.* Trial courts are vested with broad discretion in ruling questions of relevancy of evidence. *State v. Brown*, 718 S.W.2d 493[1] (Mo. banc 1986); *State v. Samuels*, 905 S.W.2d 536, 539 (Mo.App.1995). Absent a clear showing of an abuse of that discretion, appellate courts should not interfere with trial courts' rulings thereon. *Brown*, 718 S.W.2d at 493–94[1]; *Samuels*, 905 S.W.2d at 539.

 Here, Defendant contends—correctly so—that "the existence of a mental derangement may be shown to discredit a witness provided it affected the witness at the time of the incident testified to, or while he [or she] is on the stand or in the meantime so as to cripple his [or her] powers of recollection." *State v. Pinkus*, 550 S.W.2d 829, 840 (Mo.App.1977). It is also true that the interest or bias of a witness is always relevant. *State v. Bounds*, 857 S.W.2d 474, 476[7] (Mo.App.1993). However, the scope of the evidence allowable to show interest or bias and decisions on matters that may bear on a witness' credibility is largely within the discretion of the trial court. *State v. Dunn*, 817 S.W.2d 241, 245[12] (Mo. banc 1991); *Bounds*, 857 S.W.2d at 476[8]. Among the reasons for allowing trial judges wide latitude in their rulings on evidence that bears on witness credibility are concerns about prejudice, confusion of the issues, and interrogation that is only marginally relevant. *Dunn*, 817 S.W.2d at 245; *See also State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991). "Particularly when the probative value of the evidence is questionable or slight, [concerns about prejudice or confusion of the issues] may outweigh strict logical relevancy and induce the court to exclude evidence that, in the absence of countervailing factors, might well be admitted." O'Brien, *Missouri Law of Evidence*, (3rd ed.), § 10–2.

Here, the trial court did not abuse its discretion in excluding the forcible incest evidence. Over the State's objection, Defendant placed before the jury all of the evidence contained in the offer of proof regarding Victim's psychological history and difficulties, save the mental health counselor's opinion as to the cause of her problems. Thus, Kriesky, Victim's counselor, testified that in the early months of 1989, Victim was diagnosed with dysthymia (a mild depression or mood disorder), post-traumatic stress syndrome, alcohol abuse, and a borderline personality disorder. Kriesky explained that it was possible for a person to have delusions or hallucinations when suffering from post-traumatic stress syndrome and that his records indicated that Victim suffered these as well as dissociative episodes, the latter being incidents where people believe that they are witnessing something happening to them from outside their own bodies. Excerpts from Victim's records were read to the jury from counseling sessions in 1989, as well as similar sessions in 1990 after the rape.[2] Continuing, Kriesky

---

2. An example of one of these excerpts is as follows:

"She said that the past year and a half she occasionally awakened frightened, hallucinating, seeing flashing lights, and movements and has bizarre dreams of satanic figures and sees satan coming to get her. She hears voices and cursing inside her head and sometimes hears voices is [sic] calling her name and telling her ideas from outside of her head. So that she

testified that Victim had reported that she had had frequent dreams of men about to rape or stab her; that she had had suicidal tendencies; that she had involved herself in the study of the occult; that she had discussed times when she was hallucinating and seeing satanic figures and that when she had given in to these images by drinking, studying the occult, and lying, they would leave her alone; and that Victim had never completed treatment for her problems before dropping out of counseling. Kriesky testified that persons who suffer from post-traumatic stress syndrome do not necessarily lie, but they can misconstrue events or fail to remember them accurately, especially if they were having a dissociative or hallucinative episode at the time of the event. Finally, Kriesky testified that when Victim returned for counseling after the 1990 rape, she was very concerned about her difficulty in accounting for the amount of time between returning to the bar after the rape and reporting the rape to the police. Victim was so concerned, in fact, that she requested hypnosis in an effort to help her remember what had happened during that time period.

Through Kriesky's testimony, Defendant was permitted to fully show the existence of Victim's mental derangements and thus discredit her testimony, either because her mental disorders had allegedly affected her at the time of incident, or later while on the witness stand, or "in the meantime so as to cripple [her] powers of recollection." *See* *Pinkus*, 550 S.W.2d at 840. Nothing in the record, including Defendant's rejected offer of proof, suggests that Victim ever had had a dissociative or hallucinative episode as a result of a consensual act of sexual intercourse, which is what Defendant claims occurred. Consequently, the trial court could properly

have concluded that the testimony regarding the incestuous rape that occurred some thirty-eight years before trial would be irrelevant, or only marginally relevant, and would confuse the issues presented to the jury. *See Dunn*, 817 S.W.2d at 245. The crucial issue for the defense was Victim's credibility, which in turn revolved around her possible mental derangement rather than what caused her disorders. In fact, the records that were part of Defendant's offer of proof also cited Victim's "severe physical abuse as a battered wife in her first marriage" as another contributing cause for her stress disorder, enhancing the possibility that the causation evidence could properly be viewed as drawing the jury's attention away from the real issue, i.e., the credibility of Victim.

Finally, we note that Defendant never explains nor can we decipher how the evidence put before the jury about Victim's mental disorders and her attendant symptoms was "meaningless information" without the jury knowing the cause of her disorders. For the reasons explained above, this court finds no abuse of discretion in rejecting the "causation" evidence. Support for this decision is also found in a case with analogous facts, *State v. Harris*, 620 S.W.2d 349, 353 (Mo. banc 1981) (holding that evidence that an adult rape victim was also raped at age 10 was "beyond the permissible range of interrogation" and rejecting the argument that the victim's childhood rape was relevant to the defense claim that she was vindictive and thus had a motive to fabricate a rape charge). Defendant's contention of error in Point I is denied.[3]

Defendant's second point maintains that the trial court "plainly erred" when, knowing that the jury was numerically split eleven to one, it nevertheless submitted Instruction

appears to have both some hallucinatory phenomena and some dissociative phenomena."

**3.** Defendant's first point assigns two additional, albeit alternative reasons for his claim that the trial court erred in excluding this evidence. First, Defendant contends that the proffered evidence did not constitute "prior sexual conduct" by Victim, and thus such evidence was not prohibited by § 491.015, RSMo 1986, the "rape shield" statute. Alternatively, Defendant maintains that the proposed testimony "[c]onstituted evidence of immediate surrounding circum-

stances of the alleged crime, i.e.[,] [Victim's] ability to accurately perceive the events, and thus was admissible under § 491.015.1(3) RSMo 1986." Whether Defendant's proffered evidence is within or beyond the reach of the "rape shield" statute, it had to be relevant to be admissible. Therefore, we chose to analyze the relevancy issue first. Having found that the trial court did not err in excluding the questioned evidence makes it unnecessary for us to address these additional contentions.

No. 10 to the jury. Instruction No. 10 was patterned after MAI–CR3d 312.10, and is commonly known as the "hammer instruction."

The record shows that after four hours of deliberation the trial court told the prosecutor and defense counsel that unless they objected, he would initiate inquiries to the jury about the course of their deliberations using questions as suggested by "Note 4 on Uses" for MAI–CR3d 312.02. Both lawyers responded that they had no objection. The jury answered that they had not reached a unanimous decision on guilt or innocence and that they did not believe they could do so.

The trial judge then asked the lawyers if they objected to his asking the jury additional questions, and both indicated that they had no objection. Thereupon, the trial court asked the jury about the number count on their last vote, but specifically stated that it did not want to know whether a majority vote was for guilt or acquittal. The jury foreman answered, "eleven to one." Following this colloquy, the trial judge announced his intention to submit the "hammer instruction" to the jury, to which both lawyers responded that they had no objection. An instruction patterned after MAI–CR3d 312.10 was then submitted to the jury and they resumed deliberations. Approximately one hour after the "hammer instruction" was given, the jury returned with its verdict of guilty and recommended punishment of eight years imprisonment.

Defendant now claims that Instruction 10 "coerced the jury to reach a verdict of guilty," thus resulting in manifest injustice to him. He argues that "[w]hen the . . . jury is divided eleven to one . . . the coercive impact of the 'hammer' instruction is obvious[,] . . . especially . . . where, as in this case, the jury deliberated all evening and past midnight, after a full day of . . . evidence." However, Defendant concedes that this issue was not preserved inasmuch as he made no objection to Instruction No. 10, either at trial or in his motion for new trial. He requests that we

examine Point II under the plain error standards of Rule 30.20.[4]

Plain error review " 'should be used sparingly and does not justify a review of every trial error that has not been properly preserved for appellate review.' " *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995) (quoting *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990)); *State v. Davis*, 566 S.W.2d 437, 447 (Mo. banc 1978). Nevertheless, we have examined the record and conclude that there is no manifest injustice or miscarriage of justice resulting from the giving of the "hammer instruction."

In *State v. Broadux*, 618 S.W.2d 649 (Mo. banc 1981), a trial court gave a "hammer instruction" after learning that the jurors were split eleven to one and, unlike this case, also with the knowledge that the majority was in favor of conviction. On appeal, the defendant argued that "the reading of the instruction placed pressure on the one juror to conform to the majority vote because, to that juror, the instruction could mean only one thing—that the judge thought that he should reconsider his vote." *Id.* at 651. Our supreme court rejected that argument and found no prejudice, relying heavily on the fact that the instruction cautioned the juror not to "agree to a verdict that violates the instructions of the court, nor find as a fact that which under the evidence and his conscience he believes to be untrue." *Id.* at 652. The current pattern "hammer instruction," MAI–CR3d 312.10, has cautionary language comparable to that used in *Broadux*. Moreover, the instruction was not given in this case until nearly four hours after jury deliberations commenced, the time between the giving of the instruction and the verdict was approximately one hour, the trial judge did not know the position of the majority, and the giving of the instruction was in conformity with the notes on use. These are factors that appellate courts have considered in finding that trial courts did not coerce a jury by giving a "hammer instruction." *See State v. Starks*, 820 S.W.2d 527, 529–30 (Mo.App. 1991).

4. In pertinent part, Rule 30.20 reads: "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

We do not find that the "hammer instruction" was coercive in this case. Defendant did not bear his burden of establishing manifest injustice or miscarriage of justice from the giving of Instruction No. 10. Point II is denied.

### No. 20570—Postconviction Appeal

Defendant's single point on this appeal maintains that the motion court erroneously denied his Rule 29.15 motion because he received ineffective assistance of counsel at trial. Defendant complains about the fact that his trial counsel did not present the testimony of an expert witness to establish the level of Victim's intoxication at the time of the rape. At the motion hearing, Defendant adduced testimony from William Hemphill, a toxicologist, concerning Victim's probable level of intoxication at the time of the rape. Specifically, he calculated her probable blood alcohol level to be ".163 gram percent alcohol weight per volume" near the time of the charged incident. Hemphill also testified that based on his usual fee schedule, his charges for testifying at trial would have been $300 or less.

Defendant also complains about his trial lawyer's failure to present the testimony of Jamie Lazaler, an acquaintance of Defendant, regarding Victim's behavior shortly before the rape occurred. According to Defendant, Lazaler's testimony would have shown that he was at the Maple Street Grill on the evening in question and saw that Victim was acting like a "lunatic," congenial one minute and angry the next. Additionally, Lazaler would have testified that he saw Victim have several drinks, that she appeared intoxicated, that Victim and Defendant were dancing together very closely and kissing, and that Victim did not resist Defendant and allowed him to walk her home.

As to the issues raised in this point, the motion court found:

"26. This Court concludes there was a sound basis for not calling Mr. Lazaler ... and the expert witness as a matter of trial strategy, but in addition finds it did not prejudice [Defendant]. The evidence would have been cumulative of other testimony at trial. [Victim] herself testified at trial she danced with [Defendant] and that she had been drinking that evening. Both [D]efendant and Tina Wilson testified for the defense as to [Victim's conduct] that evening. It may well have been good trial strategy not to portray [Victim] as being 'Drunk' as a jury might conclude [Defendant] would be more likely to take advantage of her. The fact Mr. Lazaler was in the courthouse and was not called as a witness is a further indication of trial strategy. His two felony convictions and [counsel's] belief he had been drinking would be a deterrence for any trial strategist...."

■ Appellate review of the denial of a Rule 29.15 motion is limited to determining whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j); *State v. Ervin,* 835 S.W.2d 905, 928 (Mo. banc 1992). "The ... findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made." *Id.* at 928[42].

To prevail on a claim of ineffective assistance of counsel, a movant must show that his trial lawyer's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064[5], 80 L.Ed.2d 674, 693[10] (1984). Review begins with the strong presumption that counsel is competent and a movant has the "heavy burden" of proving counsel's ineffectiveness by a preponderance of the evidence. *Leisure v. State,* 828 S.W.2d 872, 874 (Mo. banc 1992); *Amrine v. State,* 785 S.W.2d 531, 534[3] (Mo. banc 1990).

■ Claims of ineffective assistance of trial counsel which relate to "trial strategy" do not provide a basis for postconviction relief. *Rainwater v. State,* 770 S.W.2d 368, 370 (Mo.App.1989). "The selection of witnesses is a question of trial strategy." *State v. Harris,* 854 S.W.2d 853, 857[12] (Mo.App. 1993). "A decision not to call a witness as a matter of trial strategy is virtually unchallengeable." *Id.* Moreover, the failure to call witnesses when their testimony is merely cumulative will not support a claim of ineffective assistance of counsel. *State v. Jennings,* 815 S.W.2d 434, 449 (Mo.App.1991).

Here, Defendant's trial counsel had subpoenaed Lazaler and he was present for trial. However, trial counsel testified that during the trial, Lazaler appeared to be intoxicated and was acting "very loud and mouthy" in the hallway in front of jurors during recesses. Additionally, trial counsel knew that Lazaler had a criminal history, although Lazaler had not been candid with trial counsel about the extent of that history. Trial counsel testified that he was concerned about Lazaler's behavior, discussed his concerns with Defendant, and that both agreed not to call Lazaler as a witness. Moreover, trial counsel testified that his resolve not to call Lazaler was intensified after Tina Wilson's testimony because he felt that she had left a bad impression on the jury and he did not want to demonstrate to the jury that Defendant's friends were of "the disreputable sort." Counsel reasonably determined that Lazaler's appearance as a defense witness might harm rather than help the defense. This choice is purely a question of trial strategy. Moreover, Lazaler's testimony would have been merely cumulative to that of Defendant and Tina Wilson.

Trial counsel's testimony concerning his decision not to call an expert to establish Victim's level of intoxication included the following. He and Defendant's mother talked on several occasions about calling an expert witness to establish Victim's intoxication level but counsel believed at the time that the cost was a problem for the family. Moreover, trial counsel noted that there was a lot of testimony at trial about Victim's drinking that night and the extent to which she was intoxicated, yet "[t]he business about her being very, very drunk is a double edge [sic] sword in this case." Continuing, counsel explained that evidence which tended to show Victim was highly intoxicated certainly reflected adversely on her, yet, it might also reflect on "Defendant's responsibility for any actions he had with her if she was highly intoxicated." Trial counsel gave the following summary of his trial strategy:

"My trial strategy was to demonstrate that [Victim] suffered from traumatic stress syndrome occasioned by sexual abuse as a child. My trial strategy was to show that [Victim] had had delusions of being attacked by men previously and it was all exacerbated by her drinking. She had lost her driver's license for a couple DWIs. I believe we got that into evidence. And we could establish by her morning blood alcohol and the testimony of [Defendant] and Tina [Wilson] that she had been drinking that night and was pretty drunk. I think the fact that whether she—she would have tested a .10 or 13 or .20 is irrelevant. What's relevant was that she was intoxicated ... and therefore her mental illness was exacerbated."

Such evidence supports the motion court's finding that trial counsel's decision not to call an expert to establish Victim's level of intoxication was purely a question of strategy. It also supports the trial court's finding that the expert's testimony would have been merely cumulative.

The motion court's findings are supported by the record and are not clearly erroneous. This point lacks merit.

The judgment of conviction in No. 18389 is affirmed. The order denying Defendant's Rule 29.15 motion in No. 20570 is affirmed.

CROW, P.J., and MONTGOMERY, C.J., concur.