

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD84162 |
| | ) | |
| v. | ) | OPINION FILED: April 19, 2022 |
| | ) | |
| CURTRAIL J. HUDSON, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Charles H. McKenzie, Judge

Before Special Division: W. Douglas Thomson, Presiding Judge, Gary D. Witt, Judge
and Zel Fischer, Special Judge

Curtrail Hudson ("Hudson") appeals from the judgment of the Circuit Court of

Jackson County ("trial court") convicting him, following a jury trial, of one count of murder

in the second degree, section 565.021;[1] three counts of armed criminal action, section

571.015; one count of assault in the first degree, section 565.050; and one count of unlawful

use of weapons, section 571.030.1(9).[2] Hudson raises two points on appeal: (1) the trial

---

[1] All statutory references are to the Revised Statutes of Missouri 2016, as currently updated by supplement, unless otherwise indicated.

[2] The jury returned verdicts of not guilty on one count of assault in the first degree and one count of armed criminal action for shooting Vincent Main.

court erred in excluding Dr. Witcher as an expert witness at trial; and (2) the trial court erred in refusing to instruct the jury on involuntary intoxication. We affirm.

## Factual Background

Hudson was convicted for the events that occurred on August 1, 2018. After smoking marijuana at his home in Kansas City, Hudson walked outside with his shotgun and approached the house of his neighbor and acquaintance, Surge Israel Charles ("Charles"). Hudson and Charles attended school together and occasionally played sports in the neighborhood together. Hudson found Charles outside his home and confronted him, saying, "You don't lie to me." Charles testified he did not know what Hudson was talking about. Hudson fired the shotgun at Charles, who was unarmed, and as Charles tried to run away, Hudson fired again at Charles's back. Pellets from the shotgun hit Charles in his chin, neck, back, and arms. Charles ran away from Hudson and found a neighbor who drove him to the hospital. Charles underwent surgery, suffered a collapsed lung, and still has pellets from the shotgun inside his body. Charles survived the gunshot wounds but suffered significant injuries.

At the time Hudson shot Charles, Vincent Main ("Main") was driving on the street next to Charles's house. Main heard gunshots and saw Charles staggering and holding his face in the middle of the street. Main tried to reverse his vehicle to avoid being in the line of fire. Main heard a bullet go by his head and saw Hudson running toward him with the shotgun. Realizing he could not escape Hudson while in reverse, Main drove forward while ducking down below the steering wheel. Main ascended from his crouched position while driving and was shot by Hudson in his left rib cage area. Main was able to drive to

2

a nearby house and call police from his cell phone. Main suffered surface level injuries only and did not require medical care. Main testified that he was unarmed and did not know why Hudson shot him.

After shooting at Main's vehicle, Hudson ran down the street with his shotgun. Hudson encountered Xindong Hao ("Hao"), a Chinese foreign national, outside his residence. A neighbor, Patrick Knight ("Knight"), testified that he heard three gunshots outside while he was in his house. Knight looked outside and saw Hudson holding the shotgun while Hao's body lay on the ground. Hudson fired three more shots at Hao's body, which "flickered" with each shot. Knight saw Hudson approach Hao's body lying on the ground. Hudson stood over Hao's body with the shotgun and struck Hao in the head thirteen times with the end of the weapon. Hudson ran across the street and dropped the weapon in a storm drain on the side of the road. At trial, the medical examiner testified Hao died as a result of the gunshot wounds, and the blunt force trauma to his head could have contributed to his death as well. Hudson's aunt came to pick him up. Hudson got into the car, and his aunt told him to take the battery out of his cell phone and get rid of it, which he did. However, Hudson was behaving so erratically, she made him get out of her car.

Police arrived at the scene and found Hudson "rolling around on the street" and "mumbling to himself." Hudson was arrested and taken by ambulance to the hospital for evaluation. Police recovered the shotgun from the storm drain, and the DNA on the trigger matched Hudson's DNA. Sergeant Chris Krueger of the Kansas City Missouri Police Department testified, "Based on my experience, I thought he might be intoxicated, possibly on [phencyclidine ("PCP")]." Sergeant Krueger further testified, "Usually, someone who

3

is under the influence of PCP . . . they're . . . not making sense or kind of staring off. Doing things that just normal people wouldn't do. Which rolling around in the street and mumbling to themselves would be one of those things." Sergeant Krueger testified he did not smell PCP on Hudson, which based on his experience has a "strong chemical smell."

Hudson designated Dr. Lisa Witcher as an expert witness to testify regarding the effects of PCP on the brain. The State filed a pre-trial motion in limine to exclude testimony from Dr. Witcher. Following a hearing on the State's motion, the trial court sustained the State's motion for lack of relevance but noted its ruling was interlocutory. At the time of trial, Dr. Witcher had become ill and was unable to appear. By stipulation of the parties, Hudson submitted an affidavit from Dr. Witcher which was read into the record, outside the presence of the jury, as an offer of proof. In the affidavit, Dr. Witcher was unable to say whether Hudson had ingested PCP at the time of the offense; rather, she described the effects of PCP, including psychosis, and stated, "[I]t appears [Hudson] was suffering from symptoms of psychosis at the time of the offenses. Use of PCP can trigger episodes of psychosis associated with a diagnosis of schizophrenia." The trial court sustained the State's objection to the testimony of Dr. Witcher based on relevance. Although not permitted to testify during the guilt phase of the trial, Dr. Witcher did testify before the jury during the penalty phase.

At trial, Hudson testified on his own behalf. Hudson admitted to shooting Charles, Main, and Hao. Hudson testified that before the shooting he smoked marijuana with his children's mother ("Amber") and Amber's mother at his home. At one point, according to Hudson, he lit a full joint and left the room for a moment. When he returned, only a half

4

joint remained. According to Hudson, after he smoked the remainder of this joint, he began feeling paranoid and the joint "tasted a little weird. Something I didn't taste before." Hudson testified Amber's mother was known to use PCP.

On direct examination, Hudson testified to the following: He does not have a clear memory of the incidents of that evening. After smoking the marijuana at his house, he left the house with his gun because he "started feeling like somebody was out to get me." Although he remembered shooting Charles, he has little memory of the remaining events. After shooting Charles, the next thing Hudson remembered was calling his aunt, after having shot and beaten Hao, to come get him because he believed "someone was out to get me."

On cross examination, the State admitted statements Hudson gave to police the day after the shooting in which Hudson recounted significant details of the three shootings.[3] In the police statements, Hudson stated that he called his aunt before he left his house to walk over to Charles's house telling her, "I'm fixing to go, I think I'm going to go to jail," and that she needed to come pick him up in a hurry to "beat the paddy wagon." He further described leaving the house with a 12-gauge shotgun that was spray painted gold. He went to Charles's house and began "interrogating him" about another friend "messing with" his sister. He pointed the gun at Charles asking "Bro, please tell me that he didn't mess with my sister," before shooting Charles multiple times. At some point he reloaded the shotgun. He described in his statement to police shooting Hao while Hao was on the phone because

---

[3] While an exhibit that constituted a transcript of Hudson's statement to police was admitted into evidence, that exhibit was not included in the legal file before this Court. The details of that statement set forth herein come from the cross-examination of Hudson with the use of that statement at trial.

5

he believed Hao was "in cahoots" with Charles. He then described shooting Hao in the side with a "slug" and that "he didn't go down" and was still talking on the phone and he shot him again. Hudson also stated to police that he threw the shotgun in the storm drain to get rid of the weapon. When his aunt came and picked him up he turned off his cell phone and removed the battery and threw it out the window. Finally, in response to police questioning, Hudson stated he did not smoke PCP and that nobody had dipped his joint in PCP.

The jury found Hudson guilty of one count of murder in the second degree, three counts of armed criminal action, one count of assault in the first degree, and one count of unlawful use of a weapon. The trial court refused to give the jury Hudson's submitted jury instruction on involuntary intoxication. Hudson was sentenced to twenty years in prison for murder, six years in prison for assault, fifteen years in prison for unlawful use of a weapon, and three years on each of the armed criminal action counts. The trial court ordered the murder and assault sentences to run consecutively and all other sentences to run concurrently, totaling twenty-six years in prison. This appeal follows.

**Standard of Review**

Hudson's first point on appeal raised the evidentiary issue that the trial court erred in excluding Dr. Witcher as an expert witness at trial. The trial court is vested with broad discretion to admit or exclude expert testimony. *State v. Pickens*, 332 S.W.3d 303, 318 (Mo. App. E.D. 2011). "We will not overturn the trial court's decision unless we find that the trial court clearly abused its discretion." *Id.* "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court, and is so

6

unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (internal quotations omitted). On direct appeal, "we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* (internal quotations omitted). Hudson's second point raises the instructional issue alleging the trial court erred in refusing to give his submitted instruction on involuntary intoxication. We review *de novo* a trial court's decision whether to give or refuse a requested jury instruction. *State v. Bruner*, 541 S.W.3d 529, 534 (Mo. banc 2018). "The defendant shall have the burden of injecting the issue of intoxicated or drugged condition." Section 562.076.2. "The court is required to instruct the jury on a defense only when substantial evidence to support the defense has been presented." *State v. Shields*, 862 S.W.2d 503, 505 (Mo. App. E.D. 1993).

## Analysis

Hudson first argues the trial court erred in sustaining the State's objection and excluding Dr. Lisa Witcher as an expert witness at trial because her testimony was logically and legally relevant. Dr. Witcher's testimony was being offered regarding the effects of PCP on the brain to support Hudson's defense theory that he was involuntarily intoxicated. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) [t]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) [t]he testimony is based on sufficient facts or data; (c) [t]he testimony is the product of reliable principles and methods; and (d) [t]he expert has reliably applied the principles and methods to the facts of the case." Section

7

490.065.2(1)(a)-(d). "In a criminal case, an expert witness shall not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone[.]" Section 490.065.2(3)(b).

Admissibility of evidence requires relevance. *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* "Logically relevant evidence is admissible only if legally relevant. Legal relevance weighs the probative value of the evidence against its costs--unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.*

The State argued, and the trial court agreed, that Dr. Witcher should be excluded as an expert witness because her testimony would not be logically or legally relevant to the issues before the jury. Hudson offered Dr. Witcher as an expert witness to support his defense theory that he was involuntarily intoxicated after ingesting PCP, which led to a state of psychosis in which he shot Charles, Main, and Hao. Even though Hudson was taken to the hospital after his arrest, there were no medical records admitted into evidence that showed he had PCP in his system at that time. He failed to call either of the other two individuals who were in the house when the joint was smoked, Amber and Amber's mother, in an attempt to establish that PCP was unknowingly added to his marijuana. There was no direct testimony that Hudson was in fact under the influence of PCP at the time of the offenses. Dr. Witcher provided the trial court with an affidavit that was submitted by agreement of the parties as a written offer of proof to set forth the nature of her testimony.

8

In it, Dr. Witcher stated that, based on the evidence, she concluded Hudson experienced a psychotic episode at the time of the events giving rise to these criminal charges. Although she stated under oath, "I cannot say with psychological certainty that Hudson had ingested [PCP] at the time of the offenses," she described the effects of PCP in a manner consistent with Hudson's behavior at the time of his arrest. She was clear that her actual diagnosis of Hudson was symptoms of "psychosis of *unknown etiology* at the time of the offenses." (emphasis added). Dr. Witcher also stated that although Hudson was smoking marijuana before shooting the victims, "it is not likely, as reflected in research, that the reported amount and his pattern of usage [of marijuana] would have caused this type of psychotic episode."

Dr. Witcher's testimony, as described in the offer of proof, was not relevant. "A person who is in an intoxicated or drugged condition, whether from alcohol, drugs or other substance, is criminally responsible for conduct unless such condition is involuntarily produced and deprived him or her of the capacity to know or appreciate the nature, quality or wrongfulness of his or her conduct." Section 562.076.1. "A drugged condition of a person is involuntarily produced when it is brought by the introduction into his body of any substance which he does not know and has no reason to know has a tendency to cause such a drugged condition." *State v. Samuels*, 905 S.W.2d 536, 539 (Mo. App. S.D. 1995).

"The defendant shall have the burden of injecting the issue of intoxicated or drugged condition." Section 562.076.2. "The court is required to instruct the jury on a defense only when substantial evidence to support the defense has been presented." *Shields*, 862 S.W.2d at 505. Substantial evidence is "[e]vidence which, if true, has probative force upon the

9

issues, i.e., evidence favoring facts which are such that reasonable men may differ as to whether it establishes them; it is evidence from which the trier or triers of fact reasonably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the facts, to establish which the evidence was introduced." *Pendleton v. State*, 570 S.W.3d 658, 663 (Mo. App. W.D. 2019) (quoting *Schnell v. Zobrist*, 323 S.W.3d 403, 412 (Mo. App. W.D. 2010)).

Voluntary intoxication provides no defense to Hudson under section 562.076.1. Hudon bore the burden of injecting the issue of involuntary intoxication and was required to produce substantial evidence that he was involuntarily intoxicated to support the defense. Absent substantial evidence of involuntary intoxication, evidence relating to the effects of PCP on the brain and the resulting psychosis, including Dr. Witcher's testimony, would be irrelevant. Hudson argues the following facts adduced at trial, viewed in the light most favorable to Hudson, support his theory of involuntary intoxication: Hudson testified he rolled a blunt[4] and left it unattended; when he returned the blunt was half-consumed and he began smoking it; the blunt tasted funny in an unfamiliar way; Hudson began feeling paranoid and experienced memory lapses; Hudson felt like someone was out to get him; Hudson smokes marijuana but not PCP; Sergeant Krueger testified he believed Hudson "might be" under the influence of PCP at the time of his arrest based on his erratic behavior; Hudson was hospitalized for symptoms of psychosis immediately after his arrest; Hudson

---

[4] The record contains numerous references to a "blunt," which is a "cigar that has been hollowed out and filled with marijuana." *See* Merriam-Webster's Unabridged Dictionary, https://www.merriam-webster.com/dictionary/blunt (last visited March 10, 2022, 1:08 PM). The terms "blunt" and "joint" are used interchangeably throughout the transcript.

10

told law enforcement a relative (Amber's mother) smoked PCP and must have added PCP to his marijuana by mistake.[5]

Hudson failed to inject the issue of involuntary intoxication because the record lacks substantial evidence to support it. There was no laboratory testing of the remains of the marijuana that he smoked to show it contained PCP; there was no blood test showing that he had PCP in his system when he went to the hospital following his arrest; he denied using PCP to the police, neither Amber nor Amber's mother testified he smoked marijuana containing PCP or that they had any reaction to the marijuana similar to Hudson; and there was no evidence that anyone actually put PCP in the marijuana. The only evidence to support even an inference that he was under the influence of PCP was testimony regarding his erratic behavior, which was similar to behavior that may be induced by PCP. Moreover, even if a jury could conclude that Hudson actually ingested PCP, nothing in the record supports the notion that Hudson ingested PCP involuntarily. Rather, the record merely contains Hudson's self-serving statements that Amber's mother sometimes smoked PCP and happened to be present at his house before the shooting when he was smoking marijuana. Hudson further testified that he voluntarily smoked the illegal marijuana. Therefore, Dr. Witcher's testimony would not have made a material fact more or less probable because he did not inject the issue of involuntary intoxication with substantial evidence, and the trial court did not err in sustaining the State's objection to Dr. Witcher's expert testimony.

---

[5] While Hudson argues on appeal that there was evidence that Amber's mother must have added the PCP to his marijuana by mistake, there was no testimony in the record to support this. The sole testimony regarding Amber's mother's PCP use was Hudson's testimony that she did sometimes smoke PCP.

11

Point one is denied.

In Hudson's second point, he argues the trial court erred in refusing to instruct the jury on involuntary intoxication. Hudson submitted jury instruction MAI-CR 410.52, which, as it applies to Hudson, reads:

> One of the issues in this case is whether the defendant lacks responsibility by reason of involuntary drugged condition. In this state, a person is not responsible for criminal conduct if, at the time of such conduct, as a result of involuntary intoxication, he did not know or appreciate the nature, quality, or wrongfulness of his conduct. A drugged condition of a person is involuntarily produced when it is brought about without his consent. The state has the burden of proving beyond a reasonable doubt that the defendant is not entitled to an acquittal by reason of an involuntary intoxicated or drugged condition.
>
> If you find that the defendant was in an involuntarily produced intoxicated or drugged condition which deprived the defendant of the capacity to know or appreciate the nature, quality, or wrongfulness of his conduct at the time of any offense submitted in these instructions or if you have a reasonable doubt whether he was in an involuntarily produced intoxicated or drugged condition which deprived the defendant of the capacity to know or appreciate the nature, quality, or wrongfulness of his conduct at the time of any offense submitted in these instructions, you must find the defendant not guilty.

As stated above, "The defendant shall have the burden of injecting the issue of intoxicated or drugged condition." Section 562.076.2. The court is required to instruct the jury on a defense of involuntary intoxication only when substantial evidence to support the defense has been presented. *Shields*, 862 S.W.2d at 505. We have already held that Hudson failed to properly inject the issue of involuntary intoxication because the record lacks substantial evidence that Hudson was involuntarily intoxicated by PCP.

Even if substantial evidence did support Hudson's theory that he was intoxicated by PCP as a result of his marijuana being unknowingly "laced" with PCP by some other

12

person, Hudson admits he cannot cite any Missouri cases that hold voluntarily smoking an illegal and intoxicating substance such as marijuana that, unbeknownst to the defendant, has been laced with another intoxicating substance renders the intoxication legally involuntary. By contrast, several cases from Missouri and our sister states have rejected this idea. In *Samuels*, the defendant received medication at the hospital following a medical procedure, leading to a drugged condition during which he robbed a clothing store. 905 S.W.2d at 538. The defendant argued the jury should receive an instruction on involuntary intoxication because the effects of taking the medication at the hospital deprived him of the capacity to know or appreciate the nature, quality, or wrongfulness of his conduct. *Id.* The Southern District of this Court rejected this argument, holding the "defendant consented to the medical procedure that required him to be medicated." *Id.* at 539. "[T]here was no evidence that this defendant did not know that the medication used in the medical procedure would produce a drugged condition. The medication was not imposed on defendant by trick, artifice or force." *Id.*

The court in *Samuels* relied on *Shields*, wherein the Eastern District of this Court held consuming drugs based on an addiction did not render the defendant's intoxication involuntary. *Shields*, 862 S.W.2d at 504-05. In *Shields*, the defendant used methadone to alleviate his drug addiction and argued its effects constituted involuntary intoxication. *Id.* at 505. The Court held there was no evidence the defendant did not know or have reason to know that the ingestion of methadone caused a drugged condition. *Id.* We acknowledge that both *Samuels* and *Shields* are distinguishable from these facts because in both cases

13

the defendant was aware that he had ingested the intoxicating substance that caused the alleged condition.

No Missouri court has addressed the specific issue of marijuana being unknowingly laced with another illegal substance; however, we are guided by caselaw from other jurisdictions. In *People v. Velez*, the California Court of Appeal held a defendant could not inject the issue of involuntary intoxication as a defense because he smoked marijuana that, unbeknownst to him, had been laced with PCP before he broke into the victim's house and stabbed him. 175 Cal. App. 3d 785, 795 (1985). The court distinguished intoxication via illegal substances, such as marijuana, with legal intoxicating substances to note that illegal substances do not "come with warranties of purity or quality associated with lawfully acquired drugs such as alcohol." *Id.* "Thus, unlike alcohol, unlawful street drugs are frequently not the substance they purport to be or are contaminated with other substances not apparent to the naked eye." *Id.* The court held "a reasonable person has no right to assume that a marijuana cigarette furnished to him by others at a social gathering will not contain PCP; nor may such a person assume such a marijuana cigarette will produce any predictable intoxicating effect." *Id.* at 796. Other state and federal courts follow this holding. *See Palmer v. State*, 719 P.2d 1285, 1287 (Okla. Crim. App. 1986) (rejecting a jury instruction on involuntary intoxication after defendant claimed his marijuana cigarette was laced with PCP); U.S. v. F.D.L., 836 F.2d 1113, 1117 (8th Cir. 1988) (holding the district court may have determined the intoxication of marijuana laced with PCP was voluntary).

Hudson urges us to disregard caselaw from other jurisdictions regarding intoxication as a result of smoking a PCP-laced marijuana cigarette as "outdated given marijuana's extensive regulations in numerous jurisdictions." The record also shows Hudson's counsel urged the trial court to not rely on *Velez* in its ruling on the State's motion *in limine* because *Velez* was decided "before marijuana was decriminalized[,]" in that it is now custom for individuals to not be charged for basic possession in Kansas City or Jackson County. Hudson's argument misses the mark for several reasons. First, just because the prosecuting attorneys in some jurisdictions were no longer filing criminal charges for possession of small amounts of marijuana, that has no impact whatsoever on the effects of his alleged ingestion of PCP-laced marijuana. Second, although Hudson is correct Missouri recently amended its constitution to permit the legal use of marijuana for certain medicinal purposes, Hudson committed the charged offenses before the effective date of the constitutional amendment. *See* Mo. const. art. XIV (effective Dec. 6, 2018). More importantly, there is nothing in the record to suggest Hudson was smoking marijuana for any medicinal or permitted purpose or that he obtained the marijuana from a state regulated dispensary such that its quality could be reasonably relied upon. In fact, Hudson testified he could not even remember how he purchased the marijuana or from whom. If social mores and norms surrounding the use of marijuana have changed such that its recreational use is sufficiently regulated to justify a finding of involuntary intoxication if PCP "laces" a blunt, the legislature is best equipped to pass laws reflecting that public sentiment. But, for now, because criminal statutes prohibit the recreational use of marijuana, *see* section 579.015, it remains an illegal substance lacking the warranties of

15

purity or quality associated with lawfully acquired drugs from a regulated pharmacy.[6] *See Velez*, 175 Cal. App. 3d at 795.

Regardless of whether norms surrounding marijuana use have changed over the years, the record here does not support a finding that Hudson was naïve to the risks associated with smoking marijuana. In this case, Hudson voluntarily consumed marijuana in the presence of a relative whom he knew smoked PCP. According to his own testimony, Hudson lit the blunt but left it on a table and exited the room, leaving the blunt with the same relative whom he knew smoked PCP. When he returned, half of the blunt had been smoked but he proceeded to smoke the rest of it anyway. If it is true that there was PCP on the marijuana that he smoked and that Hudson accidentally ingested PCP that evening, it is difficult to imagine a scenario in which an individual's risk of ingesting a foreign substance could be as great. Accordingly, the trial court correctly rejected Hudson's submission of MAI-CR 410.52.

Point two is denied.

### Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur

---

[6] Given that Hudson's offenses do not involve the legal purchase of marijuana, we do not opine on what impact the legal purchase of marijuana from a government regulated dispensary may have on this legal issue.

16